1

2

3

4

5

6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

7   DEREK E. GRONQUIST,

8                    Plaintiff,

9            v.

10  KELLON CUNNINGHAM; VICTOR OWENS;
    RAYDEAN GEORGE; CHRISTOPHER HICKS;
11  HERBERT PENROSE; AMANDA WESTPHAL;
    VICTORIA TAPIA; ANA GARIBAY; GREG
12  MCCOMBS; ROBERT J. LONG; JEFFERY A
    UTTECHT; ROY GONZALEZ; BERNARD
13  WARNER; and the DEPARTMENT OF
    CORRECTIONS OF THE STATE OF
14  WASHINGTON,

15                   Defendants.

CASE NO. 4:15-CV-5008-EFS

**ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT, DENYING MR.
GRONQUIST'S MOTION TO CERTIFY AND
MOTION TO SHOW CAUSE, AND CLOSING
FILE**

16

17       Derek Gronquist, a prisoner in the Washington state penal system,

18  seeks relief from a variety of wrongs he asserts were committed by

19  Washington State Department of Corrections (DOC) and its employees: 1)

20  a violation of Washington's Public Records Act (PRA), 2)

21  unconstitutional deprivation of his free speech, and 3) retaliation for

22  exercising his free-speech rights. In addition, Mr. Gronquist contends

23  that two state statutes that provide DOC with authority to regulate

24  prison mail and define "contraband" for prison-mail purposes are

25  unconstitutional. Defendants seek summary judgment in their favor on

26  the asserted claims, ECF No. 17, while Mr. Gronquist asks the Court to

ORDER - 1

certify constitutional questions to the Washington Supreme Court, ECF No. 74, and for an order requiring Defendants to show cause why documents responsive to his PRA request were not disclosed, ECF No. 84. After reviewing the record and relevant authority, the Court is fully informed and grants Defendants' summary-judgment motion and denies Mr. Gronquist's motion for certification and show-cause motion.

**A.    Factual Statement[1]**

> **1.    Public Records Act Request**

Mr. Gronquist was housed at Washington's Coyote Ridge Corrections Center (CRCC) at all times relevant to the claims in this lawsuit. On March 31, 2014, DOC received a public-records request from Mr. Gronquist for "[a]ny and all grievances filed against Correctional Officer Kellon Cunningham."[2]  Officer Cunningham had worked for Airway Heights Correction Center ("Airway Heights") and then relocated to CRCC's H-Unit, where he continues to work. The H-Unit houses about 250 minimum custody offenders, including Mr. Gronquist. As part of his job duties, Officer Cunningham conducts formal headcount, tier checks, and cell inspections, runs mainlines, supervises porters, conducts monthly reports, and monitors the sliders and offender movement.

---

[1]  The parties submitted a Joint Statement of Uncontroverted Facts. ECF No. 112. These uncontroverted facts are included in this Factual Statement without a citation to the record. Facts that are supported with a citation are those that were submitted by Mr. Gronquist, which were not flatly contradicted by the record, and those submitted by Defendants, which were not contested by Mr. Gronquist. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[2]  The request was assigned tracking log number PDU-28803.

ORDER – 2

DOC responds to thousands of public-records requests every year. Pernula Dec., ECF No. 19 ¶ 5. For instance, in 2013, DOC responded to 14,705 requests for inmate central and medical file reviews, health records, and other records. *Id.* Of these 14,705 requests, 4,418 were for records other than file reviews or offender health-related records and were handled by the unit or designated statewide public disclosure coordinators. *Id.* In response to these 4,418 requests, over 1.3 million pages were gathered and offered to requestors. *Id.* DOC staff spent more than 36,000 hours responding to these requests. *Id.* The majority of those requests include some claim of exemption and redaction or withholding of information. *Id.* At any one time, a PRA specialist may have up to 80 open public-records requests assigned to her. *Id.* After a public-records request is completed, the requestor has the opportunity to appeal the response to DOC's Public Disclosure Appeals Officer. *Id.* The Public Disclosure Unit is a centralized unit located in DOC's Tumwater headquarters building currently employing 16 full-time staff, including 3 administrative staff, 11 specialists, 1 supervisor, and 1 compliance manager. *Id.* ¶ 3.

When a public-records request is received, it is assigned a tracking number, and assigned to either a specialist within the unit or to a correctional facility or field office Public Disclosure Coordinator or records staff for processing. *Id.* ¶ 4. The specialist determines the response time-frames, which are based on many factors, including the specialist's and other staffs' current workloads; the complexity and scope of the records requested; the number of sources for potentially responsive records and any other factor which may affect the production

1    of the record. *Id.* DOC uses the SharePoint computer program to help

2    track the requests and responses thereto. *Id.*

3        The day that DOC received Mr. Gronquist's public-records request,

4    DOC Public Disclosure Specialist Darla Koflanovich sent an email to DOC

5    Grievance Program Manager Clara Curl, inquiring if there is "any way to

6    search for grievances that might contain [C/O Kellon Cunningham's] name

7    and get a report with the grievance numbers on it so I can pull them?"

8    Ms. Curl responded:

9        I would need to know when and where they worked, is there a
         timeframe to consider? We do not track complaints by staff
10       grieved. I can check all staff conducts at the facility where
         they worked. I could get you a list of log#'s pretty quickly
11       if I knew time, date, location. Does that help?

12    Ms. Koflanovich replied to Ms. Curl that she "will get the information

13    you need and route the request to you for a list."

14        On April 1, 2014, Ms. Koflanovich sent Mr. Gronquist a letter

15    acknowledging receipt of the public-records request and stating that

16    his request was interpreted as asking for "all grievances filed against

17    Correctional Officer Kellon Cunningham" and "we will contact you

18    regarding your request within 48 business days, on or before June 6,

19    2014." ECF No. 19, Attach. A at 11.

20        Ms. Koflanovich determined that Officer Cunningham worked at CRCC;

21    and she provided a copy of the request to CRCC. ECF No. 19 ¶ 9, Attach.

22    B. CRCC employees Valerie Ostrem and Mike McCourtie hand searched "all

23    paper copies of grievance records that included the name Cunningham,

24    such as "Kellon Cunningham," "K. Cunningham," or "Cunningham." ECF No.

25    20 ¶ 2. They found 40 responsive documents. Ms. Ostrem's search also

26    included a search on the log sheet for the name Cunningham to ensure

ORDER – 4

that no grievances were missed during the hand search; this log search revealed no additional grievances. *Id* ¶¶ 2 & 3. At this time, CRCC maintained paper copies of grievances for three years. *Id.* ¶ 2.

On April 4, 2014, Ms. Koflanovich wrote Mr. Gronquist a letter advising him that 40-responsive pages to his request for "[a] copy of all grievances filed against Correctional Officer Kellon Cunningham" had been gathered and would be provided to him upon his payment of the identified photocopying fees. ECF No. 19-1 at 12-13. Mr. Gronquist submitted payment. ECF No. 19-1 at 14-15. Upon receipt of the payment, Ms. Koflanovich mailed the first installment of responsive records to Mr. Gronquist on April 28, 2014. ECF No. 19-1 at 17; Attach. A at 14-17. These were not received by CRCC mailroom staff until June 12, 2014, at which time 31 of the documents were rejected by mailroom staff as contraband because the documents contained information about other inmates. Mr. Gronquist had the rejected documents mailed to his mother, Ms. Parker.

Also on April 28, 2014, Ms. Koflanovich issued a "routing slip" directing Grievance Program Manager Dale Caldwell to "gather a report with all grievances related to C/O Kellon Cunningham," clarifying that "his employment began with DOC in 2008." Mr. Caldwell responded to Ms. Koflanovich the next day, stating:

> Darla I can't comply with your request as requested. Grievances are not filed by staff member. I can ran [sic] all grievances at that facility from 2008 to present - let me know if you can narrow the search I will forward the data as listed - thank [sic].

Ms. Koflanovich replied to Mr. Caldwell that she would "contact HR and get the facilities that the officer was at and the time period for

running the report." Later that day, Ms. Koflanovich informed Mr. Caldwell that she had spoken with a fellow employee who "suggested we get a report of grievances about 'staff misconduct' for the dates and facilities" where Mr. Cunningham had worked: Airway Heights Corrections Center ("Airway Heights") from April 16, 2008, to April 15, 2011, and then CRCC thereafter. On April 30, 2014, Mr. Caldwell provided Ms. Koflanovich with a list of staff-conduct grievance numbers for the two facilities during the pertinent dates, emphasizing that he is "[n]ot sure if this particular staff is mentioned in any of them." Ms. Koflanovich replied that she would begin her review for Officer Cunningham's name within the 515 grievances listed on the report. Ms. Koflanovich located 31 grievances against Officer Cunningham amongst these grievances. Of these 31 grievances, 15 were filed at CRCC and were not located during Mr. McCourtie's and Ms. Ostrem's hand search of physical documents.

On June 23, 2014, Mr. Gronquist was told that there were 68 more responsive documents; he paid the copying fee, and the requested documents, except for 3 pages which were not disclosed due to a computer-security exemption, were mailed to Mr. Gronquist on July 23, 2014. ECF No. 19, Attach. A at 18-27. About a week later these PRA documents were received by the CRCC mailroom; mailroom staff rejected 33 pages as contraband because they contained information about other inmates. Mr. Gronquist had the rejected documents sent to his mother and requested that she redact the other inmates' names on the documents and then mail the documents back to him. ECF No. 19, Attach. A at 28-29. These redacted

documents were later rejected by the mailroom staff as contraband because they contained redactions.

In July 2014, Ms. Koflanovich requested documents related to the Prison Rape Elimination Act (PREA) investigation report against Kellon Cunningham, Report #1210062. On August 25, 2014, DOC informed Mr. Gronquist by letter that they had 98 more responsive pages. ECF No. 19, Attach. A at 31-32. The copying fee was paid, and records mailed to Mr. Gronquist. ECF No. 19, Attach. A at 35-42. DOC mailed these records to Mr. Gronquist on September 17, 2014. All but one of these records were rejected by CRCC mailroom staff because the records contained information about other inmates. The rejected records were then mailed to Mr. Gronquist's mother at Mr. Gronquist's request.

Also, on September 17, 2014, Ms. Koflanovich informed Mr. Gronquist that DOC's response to his public-records request was "complete and now closed." Ms. Koflanovich did not identify any records that were being withheld.

## 2.   CRCC Mailroom

When the documents sent to Mr. Gronquist in response to his public-records request were mailed to him at CRCC, they were subject to DOC's mail policy. Mail entering and leaving CRCC, and other DOC facilities, is subject to screening. RCW 72.09.530 provides:

> The secretary [of the Department of Corrections] shall, in consultation with the attorney general, adopt by rule a uniform policy that prohibits receipt or possession of anything that is determined to be contraband. The rule shall provide consistent maximum protection of legitimate penological interests, including prison security and order and deterrence of criminal activity. The rule shall protect the legitimate interests of the public and inmates in the exchange of ideas. The secretary shall establish a method of

reviewing all incoming and outgoing material, consistent with constitutional constraints, for the purpose of confiscating anything determined to be contraband. The secretary shall consult regularly with the committee created under RCW 72.09.570 on the development of the policy and implementation of the rule.

"Contraband" is defined as "any object or communication the secretary determines shall not be allowed to be: (a) [b]rought into; (b) possessed while on the grounds of; or (c) sent from any institution under the control of the secretary." RCW 72.09.015(5).

To implement RCW 72.09.530, DOC established Policy 450.100, Mail for Offenders. DOC Policy 450.100[3] directs designated facility staff to inspect and read incoming and outgoing mail to prevent the "[r]eceiving or sending [of] contraband or any other material that threatens the security and order of the facility through the mail, and . . . [c]riminal activity." Policy 450.100 authorizes mail to be rejected "based on legitimate facility interests or order and security and/or for any [of the 39 unauthorized mail] reasons identified:

**Mail to or from offenders, including publications and eMessages/attachments, may be rejected for any of the following reasons:**
1.   Not specifically authorized by DOC 450.100 Mail for Prison Offenders or any other policy or applicable Operational Memorandum
2.   Attempts to establish contact with a person or his/her guardian who has requested not to be contacted by the offender, when the offender is aware or should be aware of the request
3.   Violates sentencing conditions and/or court orders or otherwise attempts to establish prohibited contact between the sender and recipient

---

[3] The language of DOC 450.100 was modified during the relevant time period. *See* Gonzalez Dec., ECF No. 21, Attach. A, DOC Policy 450.100(VII) (eff. July 25, 2011) and DOC Policy 450.100(IX) (eff. Aug. 15, 2014).

ORDER – 8

4. Contains an unknown substance(s) or contraband, or relates to sending contraband into or out of the facility

5. Contains items written or drawn in crayon or gel pen, or contains or has been treated with perfume, glitter, and/or other items that could be easily misidentified

6. Contains escape plans and/or other information related to escape

7. Provides technical/detailed information on security systems, equipment, and practices used in the correctional field

8. Contains plans for activity that violates state/federal law, the Washington Administrative Code, Department policy, and/or local facility rules

9. Contains instruction and/or "how to" material for committing illegal activities

10. Depicts or describes the procedures for constructing or using weapons, ammunition, bombs, and/or other destructive devices, or includes life sized photograph(s)/graphic illustration(s) of these items

11. Provides instructions on martial arts, fighting/self-defense techniques, and/or how to disable/disarm others

12. Appears to be in code

13. Contains content in multiple languages

14. Contains written/graphic information on security equipment/operations or facility blueprints/diagrams

15. Contains detailed maps/charts of Washington, Oregon, Idaho, and/or British Columbia

16. Contains information that could create a risk of physical harm to the offender or another person if the communication were allowed

17. Contains sexually explicit material as defined in WAC 137-48-020 and/or references sexually explicit behavior. May include altered images, strategically placed graphics, or airbrushing. Sexually explicit behavior must be the predominant theme when rejecting written and/or audio based publications, letters, or eMessages.

18. The publication(s) is not in English, with the exception of authorized religious books. May include dictionaries or glossaries translating words from the language to English.

19. Contains publications or documents, other than legal mail sent from a legal entity/agency, that have been altered (e.g., pages torn/removed, extraneous markings, etc.)

20. Advocates violence against others and/or the overthrow of authority

21. Advocates that a protected class or group of individuals is inferior and/or makes such class/group the object of ridicule and/or scorn, and may reasonably be thought to

precipitate a violent confrontation between the recipient and a member(s) of the target group

22. Purports to be legal/special mail, but upon inspection is determined to be general correspondence

23. Contains cash or personal check(s)

24. Contains markings of gang symbols or symbols of other unauthorized groups that may reasonably be thought to precipitate violence

25. Contains multiple or similar copies/photocopies of the same photograph, document, and/or publication/subscription, in whole or part

26. Contains pre-franked envelopes and/or non-cancelled postage stamps, with the exception of eStamps, without prior approval from the Superintendent/designee

27. Contains correspondence, information, or other items relating to another offender(s) without prior approval from the Superintendent/designee, or attempts or conveys unauthorized offender to offender correspondence

28. Contains a blank greeting card or postcard

29. Contains a photograph, card, poster, and/or calendar that is padded, laminated/layered, musical, and/or exceeds the storage dimensions noted in DOC 440.000 Personal Property for Offenders

30. Contains an unauthorized cassette tape(s) and/or CD(s), including public disclosure CDs

31. Contains clipping(s)/copies of copyrighted material

32. Contains or attempts to obtain an item(s) not approved and paid for in advance through facility designated channels.

33. Solicits money or anything of value from anyone other than the offender's immediate family member without prior approval from the Superintendent/designee. This does not preclude authorized purchases through approved vendors

34. Requests/directs another person to provide money or anything of value to a third party without prior approval from the Superintendent/designee

35. Contains printed material other than correspondence for an offender currently assigned to a Reception Diagnostic Center

36. Contains a metal and/or inflexible binder

37. The eMessage videogram (i.e., pre-recorded video attached to an eMessage) does not comply with DOC 450.100 Mail for Prison Offenders or otherwise contains any display of nudity, behavior or actions that are sexual in nature, drugs/alcohol or related paraphernalia, weapons, graphics or paraphernalia associated with any Security Threat Group, or unlawful activity

38. Contains copies that are being sent to a Reception Diagnostic Center

ORDER – 10

39.  Contains sweepstakes, contests, lottery tickets, or other mailings soliciting or offering games of chance. Publications that contain a sweepstakes or contest entry will not be restricted. However, offenders are not authorized to enter sweepstakes or contests of any kind.

ECF No. 21, Attach. A at 45-47. In regard to unauthorized mail, DOC contends that it has a strong interest in not allowing inmates to possess grievances pertaining to other inmates because inmates can use the information therein to harass the named inmate or to intimidate and strong-arm staff. Gonzalez Dec., ECF No. 21 ¶ 6.

The mailroom staff inspect the mail and determine whether the mail may be delivered to an inmate or whether the mail must be rejected and considered "contraband" pursuant to Policy 450.100. If the mail is rejected, written notice on DOC Form 05-525, which indicates why the mail was rejected, is given to both the inmate and the sender of the mail. The notice advises the inmate of his right to appeal the rejection to the facility superintendent/designee.

If the mail rejection is appealed, the facility superintendent or his designee will review the rejection and affirm or reverse the rejection. If the mail rejection is affirmed, the inmate or sender may appeal the decision to the Assistant Secretary or his designee, who may affirm or reverse the rejection. If the mail rejection is affirmed, the inmate must pay to have the item mailed to a non-incarcerated person, or the item will be destroyed or donated to charity.

CRCC mailroom employees Victoria Tapia and Ana Garibay work in the mailroom and screen mail pursuant to Policy 450.100. On June 12, 2014, they intercepted the first installment of grievance records produced by the DOC's Public Disclosure Unit in response to Mr. Gronquist's public-

records request. They issued a rejection notice for 31 of the 40 pages because the pages allegedly contained "other offender's name/unit address/DOC numbers." Of the individuals identified as being inmates, whose names, numbers, and institutional addresses were listed on the rejected records, at least one – Robert Simonis – was not incarcerated at that time. This rejection notice was sent even though no CRCC employee or DOC official had knowledge that Mr. Gronquist had ever used information about another prisoner for an improper purpose.

Mr. Gronquist appealed the rejection to CRCC Superintendent Jeffrey Uttecht, emphasizing that:

> Over the . . . last two decades I have routinely obtained, possessed, and used grievance records filed by other inmates to remedy the unlawful conduct of DOC employees . . . [and] have never revealed the contents of those grievances to any other inmate, or used the records for an improper purpose.

Mr. Gronquist explained that he needed the records

> to discharge the duties which you fail to perform: to hold Mr. Cunningham accountable for his unprofessional and criminal conduct, and to protect Washington prisoners from further harm by his hand.

CRCC Lieutenant Robert Long, on behalf of Superintendent Uttecht, affirmed the rejection, claiming that Mr. Gronquist is "not allowed to possess information such as names and numbers of other offenders." Mr. Gronquist appealed Lieutenant Long's decision. Correctional Manager Roy Gonzalez denied the appeal, asserting that "offenders are not allowed mail containing another offender's correspondence or items." Mr. Gronquist had the rejected mail sent to his mother.

On July 29-30, 2014, CRCC mailroom officials Amanda Westphal and Greg McCombs intercepted the second installment of grievance records

produced by the DOC's Public Disclosure Unit in response to Mr. Gronquist's public-records request and issued a rejection notice for 33 of the 68 pages because they allegedly contained "information that, if communicated, could create a risk of violence and/or physical harm to any person [because they] . . . contain information about other offenders currently incarcerated in WA state." Of the individuals identified as being "currently incarcerated in WA state," at least one – Karl Tobey – was not incarcerated at that time.

Mr. Gronquist appealed the rejection to Superintendent Uttecht. Lieutenant Long, on behalf of Superintendent Uttecht, denied the appeal without comment. A subsequent appeal was denied by Correctional Manager Gonzalez, who claimed that in addition to the basis asserted by Ms. Westphal and Mr. McCombs, "item 22 would also be applicable because it contains another offenders [sic] information or documents such as the grievance you noted."

On August 28, 2014, CRCC mailroom employees Ms. Garibay and Mr. McCombs reviewed a package of documents sent by Mr. Gronquist's mother to him. These documents were the records that were previously rejected and sent to Mr. Gronquist's mother and that she then attempted to redact other inmate's names. The mailroom staff issued a notice prohibiting Mr. Gronquist from receiving these records because they were alleged to contain "another offenders [sic] information" or were "altered." Mr. Gronquist appealed the rejection to Superintendent Uttecht. That appeal was denied by Lieutenant Long without comment. Later, Superintendent Uttecht affirmed the rejection, asserting that "mailroom staff were acting in according [sic] to policy when they rejected your incoming

mail due to it being altered." Correctional Manager Gonzalez did not respond to Mr. Gronquist's subsequent appeal.

On September 22-23, 2014, CRCC mailroom employees Ms. Westphal and Mr. McCombs reviewed the third-installment of records, which were produced by DOC's Public Disclosure Unit. A rejection notice was issued, prohibiting Mr. Gronquist from receiving 98 of the 99 pages of the records because they allegedly contained "correspondence, information, or other items relating to another offender(s), or other items relating to another offender(s) without prior approval from the superintendent/designee, or attempts or conveys unauthorized offender to offender correspondence." Mr. Gronquist appealed the rejection to Superintendent Uttecht, emphasizing:

> I intend to use those records as evidence in a soon to be filed lawsuit over Mr. Cunningham's conduct and your policy of retaliating against inmates for exercising their right to freely speak. I believe these records are being singled out for censorship in your deliberate attempt to hide that unconstitutional behavior from judicial intervention.

Lieutenant Long, on behalf of Superintendent Uttecht, affirmed the rejection without comment. The appeal of this rejection was denied without comment. These rejected pages were mailed to Mr. Gronquist's mother.

### 3.  Grievance Program

DOC maintains and implements an Offender Grievance Program to "promote[] proper and effective communication between staff and offenders in an effort to resolve issues." The Offender Grievance Program requires inmates to file a grievance in order for certain complaints to be heard and considered by DOC.

To file a grievance, an inmate writes his complaint on DOC Form 5-165 or an 8½" x 11" piece of paper and deposits it in a locked grievance box. After the complaint is retrieved from the box, a facility grievance coordinator determines whether the issue presented is grievable, and if so, whether it will be processed as:

- a routine grievance: concerning "policy or procedure, lack of policy or procedure, or the actions of another offender";

- an emergency grievance: concerning "a potential serious threat to the life or health of an offender or staff member, related to severe pain being suffered by the offender, or that involve a potential threat to the orderly operation of a facility, and its resolution would be too late if handled through routine administrative or grievance channels"; or

- an employee-conduct grievance: "against a specific, identified employee . . . for alleged inappropriate demeanor, language or actions," including the allegations of "retaliation for participation in the Offender Grievance Program."

After the grievance type is established, the grievance coordinator types the complaint on Form 05-166 Level I – Initial Grievance, or Form 05-170 for employee-conduct grievances. Depending on its type, substance, and resolution, a grievance can proceed through four levels of response, investigation, or review.

To manage inmate records and grievances, DOC uses a computer system called OMNI to electronically store and retrieve inmate information.

OMNI permits: 1) remote data entry by local grievance coordinators, 2) monitoring and auditing capability both locally and at the Grievance Program Office, 3) indexing of complaints and grievances by the name of individual offenders, 4) on-time synopsis of individual grievances and their status within the grievance system, and 5) on-site generation of statistical reports. In addition to OMNI's electronic storage, paper-grievance records are maintained in the relevant facility's grievance departments for at least six months, and the master grievance file is maintained in DOC's OnBase[4] database for six years. OnBase is a document imaging database where copies of all documents generated by staff and offenders are stored.

**4.    Life at CRCC H-Unit**

Inmates at CRCC, including the H-Unit, are subject to daily headcounts at 6:20 a.m., 4:00 p.m., 9:05 p.m., and 12:00 a.m. ECF No. 97-2 at 131. To ensure the welfare of all inmates, Officer Cunningham (and the other officers) perform daily headcounts, which require the officers to count only "living, breathing flesh." Cunningham Dec., ECF No. 22, ¶¶ 1 & 2. To perform this task, Officer Cunningham loudly announces into an intercom system that headcount will promptly take place and that the inmates are to be out of their bunks. *Id*. ¶ 2. If an inmate is unresponsive to a correctional officer's request for compliance with headcount, they will be given a direct verbal directive; if still not in compliance, the correctional officer will obtain the

---

[4] The database was formerly called Liberty.

assistance of another officer before either entering the living space or escorting the non-compliant offender to segregation. *Id.* ¶ 2. Inmates are informed of the formal count times and procedures at the time they receive their orientation handbook. *Id.* The handbook specifically notes formal count will be called by unit staff and announced overhead prior to count beginning. *Id.* Inmates are also informed that, if correctional officers are required to stop during the headcount and have to ask the offender to become visible and identifiable, the offender will be infracted for interfering with count.  *Id.*

In addition to being subjected to daily headcounts, inmates have restricted access to sundry items, such as toilet paper. Part of a correctional officer's duties is to restock the H-unit with toilet paper. Officer Cunningham's standard procedure during his eight-hour shift (6:10 a.m. to 2:10 p.m.) was to resupply the unit in the morning prior to 10:00 a.m. and when notified by the bathroom porter as necessary. *Id.* ¶ 3.  Officer Cunningham contends that additional toilet paper was also provided as needed. *Id.* When the H-Unit changed to 12-hour shifts (5:30 a.m. to 6:00 p.m.), Officer Cunningham reports that toilet paper was stocked shortly after the 6:20 a.m. count, when needed throughout the afternoon, and then again prior to the graveyard shift arriving. *Id.* Officer Cunningham states that additional toilet paper is made readily available to unit porters to resupply the individual stalls when necessary, *id.;* Mr. Gronquist challenges this assertion.

On July 1 and 2, 2014, Mr. Gronquist filed grievances against Officers Cunningham and Victor Owens for screaming over the H-Unit intercom system at 6:30 a.m. and failing to stock the H-Unit bathrooms

ORDER – 17

with sufficient toilet paper. On July 8, 2014, CRCC's Grievance Coordinator Michael McCourtie attempted to informally resolve the grievances by "forward[ing] [the] complaint to [the] unit [Correctional Unit Supervisor Christopher Hicks] and the captains office." Two days later, H-unit Sergeant Raydean George sent an email to each of the eight correctional officers assigned to the H-Unit, including Officers Cunningham and Owens, stating:

> OK, even thou [sic] I like the outcome that is produced by loud meaningful announcements, it does bring a lot of negative response, that is making its way out of my control. This will be a short lived life if we try to fight to keep it as it is, sometimes it is better to retire something to keep other things ours. That being said I would like for you to turn the announcements down a notch.

Sergeant George forwarded a copy of the email to Supervisor Hicks, who in turn forwarded it to the Grievance Coordinator McCourtie.

Mr. Gronquist was not satisfied with the response to his grievances; he appealed to the next level. On July 24, 2014, Lieutenant Herbert Penrose was assigned to investigate the grievance. During his investigation, Lt. Penrose obtained statements from Mr. Gronquist, Supervisor Hicks, and Officers Cunningham and Owens.[5] During the interview, Mr. Gronquist expressed concern, which Lt. Penrose paraphrased as:

---

[5] Officers Cunningham and Owens state that they have kept the fact that Lt. Penrose questioned them about Mr. Gronquist's two grievances confidential until this lawsuit was filed. Cunningham Dec., ECF No. 22 ¶ 5. This is questioned by Mr. Gronquist.

> I believe that [O]fficer Cunningham should be evaluated to determine fitness to interact with offenders or be directly supervised-[O]fficer Cunningham has the ability to get other[s] to do what he wants, even to disobey direct orders from headquarters/Olympia.

The same day, Officer Cunningham provided a statement: "I have been unaware of [inmate] Gronquist's concerns at any time prior to typing this response[,] and first "became aware Gronquist filed a grievance making complaints about my behavior when I was interviewed about the allegations by Lt. Penrose." Concerning the loud, early morning intercom announcements, Officer Cunningham stated that it is "my full intention to continue this detail as I have for over six years as it has proven to be systematic, and productive." Officer Owens' statement denied any wrongdoing. After his investigation, Lt. Penrose found that Officers Cunningham and Owens were following CRCC's written guidelines and denied Mr. Gronquist's grievance. *Id*. ¶ 4 & Attach. B.

After his investigation about the toilet-paper stocking, Lt. Penrose determined that Officers Cunningham and Owens were complying with Operations Memorandum 440.080, which requires unit staff to ensure that all general restroom areas have toilet paper, and MI3 Unit Manual, which indicates that state-issued supplies, including toilet paper, are not for inmate retention. Penrose Dec., ECF No. 23 ¶ 3 & Attach. A.

On July 29, 2014, Officers Cunningham and Owens issued 39 disciplinary infractions to H-Unit inmates who interfered with headcount by not making themselves "present" for headcount in violation of WAC 137-25-030(214). Cunningham Dec., ECF No. 22 ¶ 6. The infractions were reviewed and approved by Supervisor Hicks.

Following these infractions, Mr. Gronquist filed a grievance against Lt. Penrose, Supervisor Hicks, Sergeant George, and Officers Cunningham and Owens, claiming they retaliated against him for filing grievances by issuing headcount infractions to H-Unit inmates. Lt. Penrose investigated this grievance as well. Lt. Penrose interviewed Mr. Gronquist, who stated that he had seen these CRCC employees engage in a pattern of retaliation and he intended to file a lawsuit concerning the retaliation. Lt. Penrose also interviewed Supervisor Hicks, Sergeant George, and Officers Cunningham and Owens. Penrose Dec., ECF No. 23 ¶ 5 & Attach. C. Through his investigation, Lt. Penrose learned that H-Unit officers had changed their headcount process in an attempt to accommodate Mr. Gronquist's previous complaint about the volume of the count announcement. But because the volume of the announcement had been lowered, the officers were needing to knock on cell fronts in order to gain compliance with headcount. *Id.* Those inmates who failed to respond to headcount directives were infracted. *Id*. Lt. Penrose found no information to support an allegation of threats made by staff to offenders who filed grievances, such as Mr. Gronquist. *Id.*

On November 18, 2014, Lt. Penrose was assigned to investigate another grievance filed by Mr. Gronquist about CRCC employee misconduct. During the interview, Mr. Gronquist indicated that Officer Cunningham was spending time on the breezeway with other officers rather than doing his job. Mr. Gronquist believed Officer Cunningham was abandoning his post and believed it was creating a safety concern. Lt. Penrose also interviewed Lt. Duncan in regard to the positioning of staff during major movement from the living units. After his investigation,

Lt. Penrose found Officer Cunningham was following CRCC written directives, which require staff to be in the breezeways to observe the movement process. He found nothing to substantiate Mr. Gronquist's claim of misconduct by Officer Cunningham. Penrose Dec., ECF No. 23, Attach D.

Inmates have filed at least 66 grievances against Officer Cunningham, ranging from destruction of property to verbal abuse based on sexual orientation or race. ECF No. 87 ¶ 1.32. Officer Cunningham called Mr. Gronquist a "fucking rat" in front of other inmates. ECF No. 87 ¶ 1.47.

In December 2014, Mr. Gronquist filed this lawsuit in state court; Defendants then removed the lawsuit to federal court. ECF No. 1. Discovery proceeded. Defendants filed the instant summary-judgment motion, ECF No. 17, and Mr. Gronquist filed his motion for certification and his motion for show-cause order. ECF Nos. 74 & 84. During the pendency of this lawsuit, Mr. Gronquist was moved from the two-man H-Unit cell he had been assigned for two years to a four-man cell in CRCC I-Unit. *Id.*

**B.    Standard**

Summary judgment is appropriate if the record establishes "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party opposing summary judgment must point to specific facts establishing a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  If the non-moving party fails to make such a

1  showing for any of the elements essential to his case for which he bears

2  the burden of proof, the court should grant the summary-judgment motion.

3  *Celotex Corp.*, 477 U.S. at 322.

4  **C.    Analysis**

5       Mr. Gronquist asserts four causes of action:

6       1.    DOC violated the Public Records Act (PRA) by conducting an

7             unreasonable search in response to his public-records request

8             for grievances against Officer Cunningham;

9       2.    Washington statutes relating to prison — RCW 72.09.530 and

10            72.09.015(5) — and the DOC mail policy are unconstitutionally

11            vague, overbroad, and create administrative censorship

12            tribunals which impose prior restraints upon speech in

13            violation of article I, section 5 of the Washington State

14            Constitution and the First and Fourteenth Amendments to the

15            U.S. Constitution;

16      3.    Defendants Garibay, Tapia, Westphal, McCombs, Long, Uttecht,

17            and Gonzalez censored the public records, which were mailed

18            to Mr. Gronquist in response to his PRA request, in violation

19            of Washington State Constitution article I, section 5 and

20            the First Amendment to the U.S. Constitution; and

21      4.    Defendants Cunningham, Owens, George, Hicks, Penrose, and

22            Uttecht violated Mr. Gronquist's First Amendment rights by

23            retaliating against him for pursuing his grievance remedies.

24

25

26

ORDER – 22

Defendants seek summary judgment in their favor on each of these claims.[6] The Court addresses each claim in turn.

**1.   Claim 1: the Public Records Act**

Defendants contend that Mr. Gronquist is unable to establish a triable issue of material fact to support his PRA claim, alleging that Defendants 1) failed to conduct an objectively reasonable search for "[a]ny and all grievances filed against Correctional [O]fficer Kellon Cunningham," and 2) withheld responsive records without properly identifying them in an exemption log. Mr. Gronquist disagrees, arguing that the public-records search and responses thereto were inadequate and further that collateral estoppel bars relitigation of the issue of whether DOC has a duty to search its records, written and electronic, for grievances by a staff member's name.

Beginning with Mr. Gronquist's argument that DOC is collaterally estopped from relitigating that it conducted an adequate PRA search, the Court finds Defendants are not collaterally estopped from arguing that the search conducted for grievances filed against Officer

---

[6] Mr. Gronquist argues that Defendants' summary-judgment motion does not address Claim 2's overbreadth or vagueness challenge or Claim 4's policy of retaliation. The Court finds that Mr. Gronquist was on notice that Defendants sought summary judgment on each of his claims and Mr. Gronquist had sufficient opportunity to provide argument and evidence to support each of these claims. Accordingly, the Court analyzes whether summary judgment is appropriate as to each of Mr. Gronquist's claims.

1  Cunningham was reasonable. Under Washington law, collateral estoppel

2  requires the party seeking preclusion to establish that:

> (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding, (2) the earlier proceeding ended in a judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding, and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied.

7  *Christensen v. Grant Cnty. Hosp. Dist. No. 1*, 152 Wn.2d 299, 307 (2004);

8  *see also Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 507 (1987). An

9  "issue" to which collateral estoppel applies may be one of law,

10  evidentiary fact, or the application of law to fact. Restatement

11  (Second) of Judgments § 27(c) (1982). Whatever the type of issue, the

12  issue must have been actually litigated and determined and that

13  determination must be essential to the judgment in order for litigation

14  of that issue to be collaterally estopped in a later action.

15  *Christensen*, 152 Wn.2d at 307; Restatement (Second) of Judgments

16  § 27(f)-(h); Moore's Federal Practice – Civil § 132.02.

17      Over a decade ago, Mr. Gronquist made a PRA request for "any and

18  all complaints or grievances ever filed against Omega Pacific Inc. or

19  Dan Stumph" – these were a medical provider and an employee who worked

20  at DOC. Unhappy with DOC's response to his PRA request, Mr. Gronquist

21  filed a lawsuit in Spokane County. The Spokane County Superior Court

22  found that DOC failed to conduct an adequate search for the records and

23  ruled in Mr. Gronquist's favor.

24      Although that case and this case both involve a challenge to DOC's

25  response to a public-records request by Mr. Gronquist, they sought

26  records about different entities — there, Omega Pacific and Mr. Stumph;

ORDER – 24

here, Officer Cunningham. Whether a PRA search is adequate is whether it was "reasonably calculated to uncover all relevant documents." *Neighborhood Alliance v. Cnty. of Spokane*, 172 Wn.2d 702, 720 (2011). This is an individualized inquiry. *Id.* And a search that was reasonably calculated to uncover all relevant documents need not have actually uncovered all responsive documents; therefore, a search can still be adequate even if additional responsive documents exist but are not disclosed. *Id.* This is because an agency need not "search *every* possible place a record may conceivably be stored, but only those places where it is *reasonably likely* to be found." *Id.*

Given the individualized assessment that a court must use to determine whether a public-records search was reasonable, the Court finds the issues in this case and Mr. Gronquist's prior PRA case are not identical. Whether DOC's search for records about Omega Pacific and Mr. Stumph was reasonably calculated to uncover documents related to them is a different inquiry than whether DOC conducted a reasonable search to uncover grievances against Officer Cunningham. Furthermore, the standards to apply when reviewing a PRA disclosure changed in *Neighborhood Alliance*. Therefore, the first collateral-estoppel factor (identical issues) is not met. DOC is not collaterally estopped from arguing that its search for documents responsive to Mr. Gronquist's request for Officer Cunningham records was reasonably calculated to uncover all relevant documents.

The Court next analyzes whether Mr. Gronquist has presented sufficient evidence to establish a triable dispute of fact as to whether DOC's search for "[a]ny and all grievances filed against Correctional

[O]fficer Kellon Cunningham" was adequate under the PRA. In pertinent part, the PRA states:

- "Public records shall be available for inspection and copying, and agencies shall, upon request for identifiable public records, make them promptly available to any person including, if applicable, on a partial or installment basis as records that are part of a larger set of requested records are assembled or made ready for inspection or disclosure." RCW 42.56.080.

- The agency has a duty to "make available for public inspection and copying all public records, unless the record falls within" a specific exemption. RCW 42.56.070.

An identifiable public record "is one for which the requestor has given a reasonable description enabling the government employee to locate the requested record." *Beal v. City of Seattle*, 150 Wn. App. 865, 872 (2009); *see also* WAC 44-14-04002(1) ("In general, a 'reasonably locatable' electronic record is one which can be located with typical search features and organizing methods contained in the agency's current software.").

Consistent with the PRA, an agency is required to:

conduct an objectively reasonable search for responsive records. . . One of the most important parts of an adequate search is to decide how wide the search will be. If the agency is small, it might be appropriate to initially ask all agency employees if they have responsive records. If the agency is larger, the agency may choose to initially ask only the staff of the department or departments of an agency most likely to have the records. . . It is better to be over inclusive rather than under inclusive when deciding which staff should be contacted, but not everyone in an agency needs to be asked if

> there is no reason to believe he or she has responsive
> records. An e-mail to staff selected as most likely to have
> responsive records is usually sufficient. Such an e-mail also
> allows an agency to document whom it asked for records.

WAC 44-14-04003(9). If the request is unclear, an agency is required to communicate with the requestor to clarify the request. RCW 42.56.520; WAC 44-14-04003(3). The agency bears the burden to establish that refusal to permit public inspection and copying was in accordance with the PRA. RCW 42.56.550(1). When interpreting and applying the PRA, the court must liberally construe the PRA's application and narrowly construe the PRA's exemptions. *Bonamy v. City of Seattle*, 92 Wn. App. 403, 408-09 (1998); RCW 42.56.030 ("In the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern."). To satisfy its burden of showing that its search was reasonably calculated to uncover all relevant documents, DOC may "rely on reasonably detailed, nonconclusory affidavits submitted in good faith" that "include the search terms and the type of search performed" and "establish that all places likely to contain responsive materials were searched." *Neighborhood Alliance of Spokane Cnty.*, 172 Wn.2d at 721.

Here, DOC submitted declarations from DOC Public Records Office employees and CRCC employees. The submitted documents and declarations indicate that upon receipt of Mr. Gronquist's PRA request, DOC asked CRCC to go through its paper records to search for "[a]ny and all grievances filed against Correctional [O]fficer Kellon Cunningham." Because CRCC had to go through its paper records by hand, it elected to produce any grievance that named Officer Cunningham.

ORDER - 27

Then DOC sought to conduct a search of its electronic database for responsive records. This database is not searchable by a staff member's name. Instead the documents are organized by the type of grievance, date, facility, offender, and/or assigned grievance number. Once the date(s), facility, offender and/or assigned grievance number(s) is selected, then the DOC employee can pull up a particular grievance through OMNI and review the grievance to determine whether it contains a staff member's name. Here, DOC pulled all employee-conduct grievances at the two facilities for the time periods for which Officer Cunningham worked, thereby excluding routine and emergency grievances.

Mr. Gronquist challenges DOC's decision to limit its search to only employee-conduct grievances. But the Court finds this employee-conduct restriction reasonable because Mr. Gronquist did not request any and all grievances "relating to" or "involving" Officer Cunningham; instead, he requested any and all grievances "against" Officer Cunningham. This is a narrow request and is consistent with the definition of employee-conduct grievance as set forth in the Offender Grievance Program literature. Therefore, the Court finds DOC reasonably interpreted Mr. Gronquist's request to seek only employee-conduct grievances.

Mr. Gronquist submits that DOC was required to confer with him regarding the scope of his public-records request before limiting the search to employee-conduct grievances, and/or at a minimum to advise him that it so limited his request. Yet, an agency has a duty to confer with the requestor if the request is unclear: Mr. Gronquist's request was not unclear, he sought grievances "against" Officer Cunningham. This

would not include routine grievances, as routine grievances pertain to policy or actions of another offender, or an emergency grievance, which concerns a threat to the life or health of an offender or a threat to the orderly operation of a facility. DOC Offender Grievance Program, ECF No. 98, Ex. 1 at 31-32. In comparison, the Offender Grievance Program defines an employee-conduct grievance: "*against* a specific, identified employee . . . for alleged inappropriate demeanor, language or actions," including the allegations of "retaliation for participation in the Offender Grievance Program." *Id*. at 32 (emphasis added). This comports with Mr. Gronquist's public-records request for grievances against Officer Cunningham, and DOC's decision to restrict its search for responsive electronic records to employee-conduct grievances at the two facilities that Officer Cunningham worked, for the dates that he worked at those facilities, was reasonably calculated to uncover all relevant documents. DOC did not need to advise Mr. Gronquist that it had not searched all electronic records for grievances against, or more broadly, concerning, Officer Cunningham.

All employee-conduct grievances for the time periods that Officer Cunningham worked at Airway Heights and CRCC were electronically reviewed to determine if it was a grievance filed against Officer Cunningham. If it was, it was produced to Mr. Gronquist. That there were apparently some grievances against Officer Cunningham that were not produced by DOC in connection with its search does not undermine that DOC's search was reasonably calculated to uncover all relevant grievances against Officer Cunningham.

Accordingly, the Court grants Defendants summary judgment as to Mr. Gronquist's PRA claim; DOC conducted a search that was reasonably calculated to discover the requested documents and it need not have conferred with Mr. Gronquist in order to clarify his request or advise him that its search included a hand search of paper records at CRCC and an electronic search of the OMNI employee-misconduct grievances.

Because the Court finds that DOC's searches were reasonably calculated to find all responsive documents, the Court denies Mr. Gronquist's Motion to Show Cause, ECF No. 84, which asks the Court to order DOC to conduct another search of its entire electronic database for all grievances during the time periods that Officer Cunningham worked at the two facilities.

**2. Claims 2 and 3: Constitutionality of RCW 72.09.530, RCW 72.09.015(5), and the Mail Policy, and 42 U.S.C. § 1983**

Mr. Gronquist asserts both a facial and an as-applied challenge to the constitutionality of two state statutes:

- RCW 72.09.530: "The secretary shall, in consultation with the attorney general, adopt by rule a uniform policy that prohibits receipt or possession of anything that is determined to be contraband. The rule shall provide consistent maximum protection of legitimate penological interests, including prison security and order and deterrence of criminal activity. The rule shall protect the legitimate interests of the public and inmates in the exchange of ideas. The secretary shall establish a method of reviewing all incoming and outgoing material, consistent with constitutional constraints, for the purpose of confiscating anything determined to be contraband. The secretary shall consult regularly with the committee created under RCW 72.09.570 on the development of the policy and implementation of the rule."

- RCW 72.09.015(5): defines "contraband" for purposes of RCW Chapter 72.09 as "any object or communication the secretary

ORDER – 30

1                determines shall not be allowed to be: (a) [b]rought into;
(b) possessed while on the grounds of; or (c) sent from any
2                institution under the control of the secretary."

3   Defendants ask the Court to rule that RCW 72.09.530 and RCW 72.09.015(5)

4   are constitutional because: 1) these statutes do not impose a final

5   prior restraint on lawfully obtained and true matters of public record

6   in violation of Washington State Constitution article I, section 5 of

7   the, 2) these statutes are not overbroad in violation of article I,

8   section 5 of the Washington State Constitution and the First Amendment,

9   and 3) the statutes sufficiently define terms consistent with the

10   Fourteenth Amendment Due Process Clause – a protection that applies only

11   to penal sanctions.

12       Rather than have the Court rule on these issues, Mr. Gronquist

13   asks the Court to certify the following questions to the Washington

14   Supreme Court:

15       1.   Whether RCW 72.09.530 violates Article I, section 5, of
the Washington State Constitution by creating an
16           administrative censorship system that allows prison
officials to impose final prior restraint censorships
17           upon communications mailed to a prisoner in the absence
of judicial superintendence?
18

19       2.   Whether DOC orders imposing prior restraint censorships
upon a plaintiff prisoner's receipt, review, and use of
20           lawfully obtained, true, matters of public record
revealing the misconduct of prison officials violates
21           Article I, section 5 of the Washington State
Constitution?

22       3.   Whether Article I, section 5 of the Washington State
Constitution provides greater protection to the free
23           speech rights of prisoners than the First Amendment to
the United States Constitution and, if so, what is the
24           appropriate standard to review prisoner state
constitutional free speech claims under?
25

26       4.   Whether the word "contraband" used in RCW 72.09.530 and
defined by RCW 72.09.015(5) is unconstitutionally vague

under the Due Process Clause of the Fourteenth Amendment
to the U.S. Constitution?

5.  Whether RCW 72.09.530 and RCW 72.09.015(5)'s use of the
word "contraband" to define what may be censored is
overbroad in violation of Article I, section 5 of the
Washington State Constitution or the First Amendment to
the U.S. Constitution by sweeping within its ambit
lawfully obtained, true, matters of public record that
reveal the misconduct of state employees?

ECF No. 74 at 2-3. Mr. Gronquist submits that these questions, in
particular the first three questions, are matters of first impression
in Washington, and that the Washington Supreme Court, not this Court,
should resolve these questions. Defendants oppose certification,
contending that these issues can be decided under existing Washington
Supreme Court case law, including *State v. Gunwall*, 106 Wn.2d 54, 64
(1986), and *Livingston v. Cedeno*, 164 Wn.2d 46 (2008).

RCW 2.60.020 permits federal courts to certify issues to the
Washington Supreme Court:

When in the opinion of any federal court before whom a
proceeding is pending, it is necessary to ascertain the local
law of this state in order to dispose of such proceeding and
the local law has not been clearly determined, such federal
court may certify to the supreme court for answer the question
of local law involved and the supreme court shall render its
opinion and answer thereto.

RCW 2.60.020. The decision to certify an issue to a state supreme court
lies within a district court's sound discretion. *Lehman Bros. v. Schein*,
416 U.S. 386, 391 (1974). But federal courts should only certify issues
after careful consideration because this procedure is "reserved for
state law questions that present significant issues, including those
with important public policy ramifications, and that have not yet been

ORDER - 32

resolved by the state courts." *Kremen v. Cohen,* 325 F.3d 1035, 1037 (9th Cir. 2003).

>        a.    **Free Speech: overbreadth – prior restraint**

The free-speech issues raised by Mr. Gronquist are complicated and multi-faceted given the many articulated free-speech analytical tests, which are dependent on the type of speech, the forum, and the nature of the restriction. The constitutional provisions at issue provide:

- First Amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for redress of grievances."

- Washington Constitution Article 1section 5: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."

These rights extend to the right to receive information and ideas. *Bradburn v. N.C. Reg'l Library Dist.*, 168 Wn.2d 780, 803 (2010). And "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987).

Based on these free-speech principles, Mr. Gronquist contends that DOC is violating prisoner's free-speech rights by imposing overbroad, prior restraints on communications, i.e., treating documents that are mailed to prisoners in response to a Public Records Act request as contraband and thereby rejecting the documents.

In addition to these free-speech principles, the Court must also consider that both the U.S. Supreme Court and the Washington Supreme Court recognize that courts are "ill-equipped to deal with" the complex problems facing prison administrators in regard to planning and committing prison resources. *Turner*, 482 U.S. at 84-85 (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)); *McNabb v. Dep't of Corrs.*, 163 Wn.2d 393, 406 (2008) ("*Turner* calls for judicial deference to the decisions of prison administrators in light of their unique interest in maintaining security and day-to-day order."). Therefore, judicial restraint is to be accorded when reviewing prison regulations and administrative policies. *Turner*, 482 U.S. at 84-95; *McNabb*, 163 Wn.2d at 406 ("Consonant with *Turner* and the majority view amongst our sister states, we conclude that the unique demands of prison administration warrant judicial deference to prison administrative decisions.").

In order to serve both of these interests (the constitutional rights of inmates, and deference to prison authorities as to the maintaining of prison security), the U.S. Supreme Court formulated a standard of review for prisoner's constitutional claims under the First Amendment:

1.    "There must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it";

2.    "[W]hether there are alternative means of exercising the right that remain open to prison inmates";

3.  "[T]he impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and

4.  Whether there are "obvious, easy alternatives" to the prison regulation.

*Turner*, 482 U.S. at 89-91 (internal citations and quotations omitted); *see also Hudson v. Palmer*, 468 U.S. 517, 547 (1984) (Stevens, J., concurring) ("This Court has held that the First Amendment entitles a prisoner to receive and send mail, subject only to the institution's right to censor letters or withhold delivery if necessary to protect institutional security, and if accompanied by appropriate procedural safeguards.").

Mr. Gronquist submits that the federal *Turner* standard does not apply to his Washington free-speech overbreadth and prior restraint claims because article I, section 5 provides more protection for speech activities than does the First Amendment. Mr. Gronquist aptly points out that Washington courts have not specifically ruled on the issue of what standard of review to apply under these circumstances. In fact, the Washington Supreme Court specifically highlighted it was not asked to rule on this issue in *Livingston v. Cedeno*, wherein the court ruled that DOC's refusal to allow a prisoner access to public records, which were sent to him in response to a PRA request, did not violate the PRA: "Livingston has not challenged the reasonableness of the [DOC]'s mail policy or the characterization of the record as 'contraband.'" 164 Wn.2d 46, 55 (2008).

Mr. Gronquist asks the Court to apply the six-factors[7] set forth by the Washington Supreme Court in *State v. Gunwall*, 106 Wn.2d 54, 64 (1986), to determine whether the Washington Supreme Court will apply a less deferential standard to DOC's mail "contraband" policy than the federal *Turner* standard. However, the Court need not engage in a *Gunwall* analysis because Washington Supreme Court jurisprudence, including *City of Seattle v. Huff*, 111 Wn.2d 923 (1989), *Bradburn v. North Central Regional Library District*, 168 Wn.2d 789 (2010), and *Livingston*, provides guidance as to the standard to apply in this circumstance — the same standard as that utilized under the First Amendment.

As Washington jurisprudence recognizes, a Washington state prison is a nonpublic forum. *Bradburn*, 168 Wn.2d at 813-14 (recognizing that a public forum is a forum that the government makes open for use by the public to assemble, express thoughts, and discuss public questions). In *Huff*, the Washington Supreme Court ruled that when a nonpublic forum is at issue, federal analysis applies. 111 Wn.2d at 928 (utilizing federal standards to analyze a viewpoint neutral Seattle ordinance that prohibited threats made during a telephone call). Therefore, article I,

---

[7]  In *Gunwall*, the Washington Supreme Court set forth six factors that a court considers when determining whether the Washington State Constitution extends broader rights to Washington citizens than the U.S. Constitution: 1) the state constitution's textual language, 2) whether there are significant differences in the texts of parallel provisions of the federal and state constitutions, 3) state constitutional and common law history, 4) preexisting state law, 5) the state and federal constitution structural differences, and 6) whether there are matters of particular state interest or local concern. 106 Wn.2d at 61.

section 5 does not afford more protection than the First Amendment in the confines of a prison — a nonpublic forum. *See id.*

As previously stated, *Turner* sets forth a deferential constitutional standard of review in regard to prison management. The federal analysis used to analyze a free-speech matter within the prison setting. This deferential standard is consistent with the Washington Supreme Court's holding in *Livingston*. While *Livingston* did not address the First Amendment constitutional question, the Washington Supreme Court's decision was rooted in the understanding that DOC "has broad discretion to decide . . . [what] records may be allowed inside a correctional institution" in light of "legitimate penological [safety] interests." 164 Wn.2d at 52 & 54. This is because "[t]he primary objective of the correctional system . . . is to provide the maximum feasible safety' for the public, staff, and inmates." *Id.* at 52-53 (quoting RCW 72.09.010(1)).

Based on the language and holding in *Livingston* and because Washington applies federal analysis to speech in nonpublic forums (a prison), the Court determines that Washington state courts will apply the federal *Turner* test to the free-speech issue before the Court: whether RCW 72.09.530 and RCW 72.09.015(5) and the mail policy are overbroad and constitute a prior restraint. Accordingly, the Court decides it is unnecessary to certify Mr. Gronquist's third proposed question: whether article I, section 5 of the Washington State Constitution provides greater protection to the free-speech rights of prisoners than the First Amendment. In this regard, Mr. Gronquist's motion to certify is denied.

The Court now analyzes Mr. Gronquist's facial overbreadth and prior-restraint challenges to the two Washington statutes and prison mail policy. A prior restraint on speech is "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1975). A statute may be invalidated as overboard if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Wash. State Grange v. Wash. State Rep'n Party*, 552 U.S. 442, 449, n.6 (2008) (internal quotation marks omitted), or if there "no set of circumstances exist under which" the statute would be valid, or the statute lacks any "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted). An overbreadth analysis requires the court to construe the challenged statute to determine what the statute covers. *Stevens*, 559 U.S. at 474.

The language of RCW 72.09.530 and RCW 72.09.015(5) provides considerable discretion to the DOC Secretary to adopt rules (or to define contraband) consistent with the "maximum protection of legitimate penological interests, including prison security and order and deterrence of criminal activity." RCW 72.09.530. RCW 72.09.530 also recognizes that prison mail policies must "protect the legitimate interests of the public and inmates in the exchange of ideas." To implement these statutory directives, DOC created and implemented the DOC Policy 450.100 and its 39 unauthorized-mail categories.

To determine whether these statutes and the mail policy are overbroad or unconstitutional prior restraints, the Court evaluates them under the four *Turner* factors. *See Shakur v. Schriro*, 514 F.3d 878,

884 (9th Cir. 2008) (summarizing *Turner* factors). As to the first *Turner* factor, DOC has identified a valid, rational connection between these statutes and its prison mail policy: the need to maintain the safety and security of the offenders, staff, facilities, and public. DOC staff inspect and read incoming and outgoing mail to prevent criminal activity and to restrict the receipt of any material that threatens the security and order of the facility. DOC considers mail that contains other offender information to be mail that threatens the security and order of the facility because if another offender receives such information there is a possibility that information will be used to blackmail offenders or staff or to target them for harassment or violence. These are valid, rational reasons for RCW 72.09.530 and RCW 72.09.015(5) and its implemented mail policy.

As to the second *Turner* factor, whether inmates have alternative means of exercising their First Amendment free-speech right to receive mail, the mail policy permits an inmate to have rejected mail sent to an individual outside of the facility or to seek prior approval from the superintendent or his designee to receive the mail. The mail policy also establishes a multi-level appeal system to challenge a mail rejection. Mr. Gronquist complains that this alternative is practically ineffective because he sought to have his mother redact the other offender's names and numbers from the public records but then when these redacted records were returned that they were rejected again for being redacted. Further, Mr. Gronquist contends that in order for him to be able to pursue litigation that seeks to correct wrongdoings by prison staff he must have access to the material — not his mother who is a lay

person. The Court recognizes that Mr. Gronquist's pre-lawsuit ability to obtain and possess records pertaining to other inmates is restricted, and that he is largely unable to take steps to remedy systemic wrongs in the prison without litigation. However, Mr. Gronquist has the ability to file grievances to seek relief for action taken against him by a prison official, and the record reflects that he has exercised this right. Further, once Mr. Gronquist files a lawsuit alleging a systemic wrongdoing at the prison, Mr. Gronquist has the ability to ask the court for leave to receive and possess grievances that contain other offender's names and numbers.

As to the third *Turner* factor (the impact accommodating the constitutional right will have on guards, other inmates, and prison resources), Unauthorized Mail potentially poses a safety risk to the facility staff and other inmates. If Unauthorized Mail is not considered contraband and the mail is permitted to be received and possessed by inmates, the prison will need to retain additional staff and officers to ensure that the information contained in the mail is not used in a way that is dangerous or harmful to staff and other inmates.

As to the final *Turner* factor, there are no obvious, easy alternatives to the mail policy. As the Supreme Court and Washington Supreme Court have both recognized, managing and operating a prison facility safely is not an easy task. Restricting the access of the materials and information listed as "Unauthorized Mail" eases DOC's difficult management task. The Court must defer to DOC to make this assessment.

After weighing the *Turner* factors, the Court denies Mr. Gronquist's facial challenge to RCW 72.09.530, RCW 72.09.015(5), and the DOC mail policy. *See Wolff v. McDonnell*, 418 U.S. 539, 575-76 (1974) (permitting prison review procedure whereby officers are present when legal mail is opened to ensure there is no contraband). These statutes and the mail policy are not facially overbroad or an unconstitutional prior restraint – they are not applied in a substantial number of unconstitutional manners, there are circumstances under which the statutes and mail policy are valid, and the statutes and mail policy serve a legitimate penological interest. Prison administration is a complicated task. Although prisoners retain their constitutional right to receive mail, this constitutional right is limited by the prison's need to appropriately maintain order. This is legitimately done by restricting an inmate's receipt of documents pertaining to other offenders without prior superintendent approval or court permission. Defendants are granted summary judgment as to Mr. Gronquist's facial overbreadth and prior-restraint challenges.

Because *Turner* and its progeny and the above-listed Washington jurisprudence provide the Court with sufficient guidance to resolve Mr. Gronquist's facial challenges, the Court declines to certify his first, second, and fifth proposed questions. Mr. Gronquist's motion to certify is denied in this regard.

### b.    42 U.S.C. § 1983

In addition to his facial overbreadth and prior restraint constitutional challenges, Mr. Gronquist asserts an as-applied constitutional challenge pursuant to 42 U.S.C. § 1983, alleging that

Defendants violated his free-speech rights under the First Amendment and article I, section 5 of the Washington State Constitution by rejecting the majority of his public records because they contained another offender's information or were altered.

As set forth above, the Court finds the mail policy serves DOC's legitimate interest in ensuring the safety of other inmates and the staff at DOC. Mr. Gronquist could have sought advance permission from the superintendent to possess the grievances against Officer Cunningham brought by other inmates; he did not do so. DOC does not argue that Mr. Gronquist has appropriately used the information contained in grievances and other records. Regardless, the Court finds that DOC did not violate Mr. Gronquist's free-speech rights by rejecting both the unredacted and redacted public-records documents. Each of his appeals were considered. And although each appeal was denied, the Court finds that the decisions to uphold the rejection of the mailed records were based on a legitimate, penological interest of maintaining prison security.

For these reasons, Defendants are granted summary judgment on Mr. Gronquist's third claim, brought under 42 U.S.C. § 1983, for unconstitutional prior restraint on speech.

### c.   Vagueness Challenge

Mr. Gronquist also claims that his due-process rights under the Fourteenth Amendment and Washington State Constitution article I, section 3 were violated because RCW 72.09.530 and RCW 72.09.015(5) are unconstitutionally vague. In support of his void-for-vagueness argument, Mr. Gronquist cites to *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). *Kolender* however recognizes that the void-for-vagueness

doctrine is used to challenge a penal sanction: "the void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 356. The Second Circuit applied the void-for-vagueness doctrine to a prison disciplinary rule when the inmate was charged with an anti-contraband rule. *Farid v. Ellen*, 593 F.3d 1233 (2d Cir. 2010 (analyzing whether a prison rule, which the plaintiff was charged with violating, was unconstitutionally vague).

Mr. Gronquist was not charged or infracted in regard to the rejected public records. Instead, he was merely prevented from having them while at the prison. The void-for-vagueness doctrine does not apply to this situation. Defendants' summary-judgment motion is granted in this regard. And Mr. Gronquist's motion to certify his void-for-vagueness claim to the Washington Supreme Court is denied.

### 3. Claim 4: Retaliation

Defendants ask the Court to find that Mr. Gronquist failed to present evidence to support his retaliation claim under 42 U.S.C. § 1983. As an inmate pursuing a First-Amendment-based retaliation claim, Mr. Gronquist must establish: 1) that he was subjected to adverse action, 2) because of 3) his protected conduct and 4) Defendants' action chilled his exercise of his First Amendment rights, and 5) Defendants' action did not reasonably advance a legitimate correctional goal. *See Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2004). To prove the "because of" prong, Mr. Gronquist must establish that his protected conduct played a "substantial part" in Defendants' decision to engage

in adverse action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977).

Mr. Gronquist submitted sufficient evidence that he engaged in a protected activity, i.e., he filed grievances regarding the lack of toilet paper and Officer Cunningham's and Owens' loud, "lengthy tirade" headcount warnings over the intercom system. However, Mr. Gronquist did not clearly identify the adverse action taken against *him* by Officers Cunningham and Owens following the filing of these grievances and later grievances.

The Court's review of the record elicits that Mr. Gronquist claims that Officer Cunningham called him a "fucking rat" in front of other inmates and was verbally rude to him, and that in October 2015, he was demoted from a two-man cell in the H-Unit to a four-man cell in I-Unit. Although verbally abusive language is unacceptable behavior from a corrections officer, whose purpose is to maintain order by modelling appropriate behavior, this level of verbal harassment and abuse is not sufficient by itself to constitute adverse action. *See Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (finding that sheriff's vulgar threat to hang the inmate and laughing at him was not sufficient adverse action)). And Mr. Gronquist fails to show that his transfer to a different cell more than a year after he filed the initial grievances was in retaliation for these grievances. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) (finding that a nearly 18-month lapse between the protected activity and the adverse action was too remote by itself to give rise to an inference of causation). Further,

there is no evidence that Officers Cunningham and Owens were responsible for this housing change. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (looking at whether the individuals responsible for a cell reassignment were the same individuals as who engaged in the alleged retaliatory conduct).

Mr. Gronquist also provided declarations from other inmates who stated that Officer Cunningham commented that he was issuing disciplinary infractions in relation to headcounts because "people are complaining about how we are doing our counts" and therefore "everyone is going to pay." *See* Muldrow Dec., ECF No. 88 at 2. There is no evidence submitted, however, that Officer Cunningham or Officer Owens advised the other inmates that it was Mr. Gronquist who had complained about the headcounts. *Cf. Valandingham v. Bojorquez*, 866 F.2d 1135, 1137-40 (9th Cir. 1998) (identifying that the prison officers told other inmates that the plaintiff was a snitch). And even if there was a casual retaliatory connection between Mr. Gronquist's protected activities and the officers' issuance of infractions against the other inmates, this was not adverse action taken against Mr. Gronquist.

Therefore, even if Officer Cunningham's and Officer Owen's conduct would chill or silence a person of ordinary firmness from future First Amendment activities, Mr. Gronquist's retaliation claim fails to survive summary judgment because he failed to present evidence that he was subjected to an adverse action by Defendants because of his protected activity. *See Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (setting forth standard). For this reason, the Court grants Officers Cunningham and Owens summary judgment as to Mr. Gronquist's retaliation

claim. Further, the Court grants Defendants Penrose, George, Hicks, Uttecht, and Warner summary judgment on this retaliation claim as well because there is no evidence that these Defendants personally participated in any retaliatory action against, or decision making as to, Mr. Gronquist because he filed grievances. Because summary judgment is granted in these Defendants' favor, the Court need not analyze Defendants' request for qualified immunity.

Lastly, the Court grants Superintendent Uttecht summary judgment as to Mr. Gronquist's claim that Superintendent Uttecht fostered a policy or custom that permitted Officer Cunningham to retaliate against inmates who file grievances at CRCC and improperly appointed Lt. Penrose to investigate the grievance — a grievance which named Lt. Penrose as one of the retaliating officials. An unconstitutional policy or custom may be found either 1) in an affirmative proclamation of policy or 2) in the official's failure to take remedial steps after violations. *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001). Mr. Gronquist has not identified an affirmative proclamation of policy. And there is no indication that Superintendent Uttecht was responsible for appointing Lt. Penrose as the individual who would investigate Mr. Gronquist's retaliation-based grievance—a grievance that named Lt. Penrose as well. Rather, Mike McCourtie assigned Lt. Penrose as the investigator. And the records reflect that Lt. Penrose interviewed relevant staff, Mr. Gronquist, and other offenders when appropriate. Mr. Gronquist was able to appeal this decision, and he did so. These records do not reflect a custom of turning a blind-eye to complaints.

ORDER – 46

1    Mr. Gronquist also contends that Superintendent Uttecht also
2    fostered a policy that permitted Officer Cunningham to retaliate against
3    Mr. Gronquist and other individuals for filing grievances. However, as
4    stated above, there is insufficient evidence to survive summary judgment
5    that Officer Cunningham retaliated against Mr. Gronquist, or other
6    individuals, for filing grievances. Mr. Gronquist has submitted
7    insufficient evidence that Superintendent Uttecht has turned a blind
8    eye to wrongdoings by officers and staff at CRCC.

9    For these reasons, Defendants are granted summary judgment as to
10   retaliation: Claim 4.

11   **D.    Conclusion**

12   For the above-given reasons, **IT IS HEREBY ORDERED:**

13   1.    Defendants' Motion for Summary Judgment Pursuant to Fed. R.
14         Civ. P. 56, **ECF No. 17**, is **GRANTED.**

15   2.    Mr. Gronquist's Motion to Certify, **ECF No. 74**, is **DENIED.**

16   3.    Mr. Gronquist's Motion to Show Cause, **ECF No. 84**, is **DENIED.**

17   4.    The Clerk's Office is to enter **judgment** in Defendants' favor
18         with prejudice.

19   5.    All pending dates and deadlines are **STRICKEN.**

20   6.    This file shall be **CLOSED.**

21   **IT IS SO ORDERED.** The Clerk's Office is directed to enter this
22   Order and provide copies to Mr. Gronquist and counsel.

23   **DATED** this ___20th___ day of May 2016.

24

                        s/Edward F. Shea
25   _____
                        EDWARD F. SHEA
                 Senior United States District Judge

26